979 So.2d 579 (2008)
DELTA CHEMICAL CORP., Lee Mauberet and Ross Heidingsfelder
v.
Bill LYNCH as the Inspector General for the State of Louisiana, Office of the Inspector General of the State of Louisiana, Louisiana State Racing Commission and Sandra Jones.
No. 2007-CA-0431.
Court of Appeal of Louisiana, Fourth Circuit.
February 27, 2008.
*581 George D. Fagan, Wendy L. Rovira, Leake & Andersson, L.L.P., New Orleans, LA, for Plaintiff Appellant.
Charles C. Foti, Attorney General, Carey B. Daste, Special Assistant Attorney General, E. John Litchfield, Special Assistant Attorney General, Berrigan Litchfield Schonekas Mann Traina & Bolner, LLC, New Orleans, LA, for Bill Lynch as the Inspector General for the State of Louisiana, Office of Inspector General of the State of Louisiana.
(Court composed of Judge JAMES F. McKAY, III, Judge MICHAEL E. KIRBY, Judge MAX N. TOBIAS, JR.).
MAX N. TOBIAS, JR., Judge.
The plaintiffs, Delta Chemical Corp. ("Delta"), Lee Mauberret, and Ross Heindingsfelder (hereinafter collectively referred to as "the plaintiffs"), appeal a judgment awarding the defendants, Bill Lynch as the Inspector General ("IG") for the State of Louisiana and Office of the Inspector General of the State of Louisiana, attorney's fees and costs in the total amount of $20,000.00. After reviewing the record and applicable law, we reverse the judgment and remand the matter to the trial court for a determination of attorney's fees consistent with this opinion.
In May 2000, the plaintiffs filed a defamation suit against Bill Lynch as the Inspector General for the State of Louisiana and Office of the Inspector General of the State of Louisiana, the Louisiana Racing Commission ("the Commission"), and Sandra Jones based upon two reports prepared and published by the IG. The reports dealt with the plaintiffs' attempt to obtain a brand name contract from the Louisiana Office of State Purchasing ("State Purchasing").[1] The draft and final reports issued by the IG in 1999, concluded, among other things, that Delta's brand name contract had been improperly awarded and recommended that State Purchasing rescind Delta Chemicals brand name contract.[2]
*582 The defendants' filed a special motion to strike in 2000; it was eventually argued before the trial court on 27 May 2005. Without providing reasons, the trial court rendered judgment, denying the defendants' motion and awarding plaintiffs reasonable attorney's fees and costs. The IG and the Commission both filed applications for supervisory writs.
This court granted the supervisory writs, reversed the judgment of the trial court, and dismissed the IG and the Commission from the lawsuit. In addition, we remanded the matter to the trial court to award reasonable attorney's fees and costs to the IG. The trial court subsequently awarded the sum of $20,000.00. This appeal followed.
The plaintiffs assign five errors for our consideration. First, they argue that our previous rulings were manifestly erroneous and should be reversed. Second, they contend that the award of attorney's fees to the IG is in derogation of common rights and is inconsistent with the legislative purpose and intent of La. C.C.P. art. 971. Third, they maintain that the trial court made the attorney's fees award without considering the appropriate factors for making such an award. Fourth, they insist that the trial court failed to consider mitigating factors when determining the amount of attorney's fees to be awarded. Finally, they assert that the award of attorney's fees is excessive and not supported by any evidence.
The plaintiffs sell water treatment chemicals for use in commercial/industrial heating, ventilation, and air conditioning systems. In 1998, the plaintiffs sought to acquire a brand name contract from State Purchasing. According to the record, State Purchasing requires three letters of intent from three state agencies in order to establish the demand for a specific product. The IG's reports quote State Purchasing requirements accordingly: "These letters must include those items that the agency intends to purchase or rent, and the correct packaging, including the anticipated annual usage per item, and letters must be signed by proper administrative personnel."
Beginning in February 1998, three state agencies prepared five letters for State Purchasing requesting that the plaintiffs be awarded a brand name contract. Halbon Terry Sharp, a maintenance foreman at Southeast Louisiana Hospital ("Southeast"), prepared two letters of intent on behalf of the hospital for State Purchasing. The first letter listed nine chemicals along with the hospital's intended usage amounts. The second letter listed 24 chemicals along with the hospital's intended usage amounts. Both letters begin accordingly: "Please see that Delta Chemical Corp. is approved to bid on a brand name contract. We anticipate using the following items." The IG's reports state:
The hospital has purchased only nine chemicals, of which some were not included on the first list, and not in the quantities anticipated. Mr. Sharp confirmed that Delta Chemical supplied him the information for the two letters. The letters are false as they pertain to the hospital's usage. Joseph Vinturella, administrator for the hospital, said the proper procedure would have been for *583 the purchasing office to have sent any letter of intent to State Purchasing.
Helene Huddleston, site facilitator for Delgado College's ("Delgado") Kenner office, also prepared two letters of intent for State Purchasing at the request of the plaintiffs. The first Huddleston letter contained a list of seven chemicals and the respective anticipated usages. The second mirrored the second Southeast letter. The IG's reports found that Delgado's Kenner office is leased, performs no maintenance on its air conditioning system, and thus has no use for the plaintiffs' products. In fact, the reports note that Delgado's Kenner office never bought or used any products from the plaintiffs.
Ms. Huddleston acknowledged preparing the letters of intent to the IG, but disclaimed any knowledge of the chemicals listed or how the usage rates were devised. She told the IG that Delta gave her the list of chemicals and usage rates and stated that she could not remember whether she composed the letters herself or copied them from other sources.
The IG spoke with Joseph Toomy, a Delgado Vice Chancellor, who stated that Ms. Huddleston should not have prepared the letters of intent on Delgado's behalf. Rather, Mr. Toomy stated that George Gray, the supervisor of heating and cooling systems, was the person who should have sent the letters of intent. The IG spoke with Mr. Gray, who stated that he knew nothing about letters or Ms. Huddleston. Further, Mr. Gray told the IG that Delgado could not have used the amount of chemicals listed in the two letters on all of it's campuses in a year.
The letter prepared by the Commission contained the same list of 24 chemicals and the same usage amounts as found in Southeast and Delgado letters. Like Delgado, the Commission leases its facility, and thus has no need for Delta products. Sandra Jones, a buyer for the Commission, allegedly signed the Commission's letter of intent. Ms. Jones denied signing the letter, and an unnamed Commission official asserted that the Commission had no knowledge of the letter. The IG's reports recount these facts accordingly:
The letter was signed "Sandra Jones, Purchasing Clerk/LSRC." Ms. Jones stated that she did not sign the letter and has no knowledge of Delta Chemical. She said she would not have identified herself as a purchasing clerk on a letter and instead would have only put "Purchasing" on the title line under her signature. Ms. Jones said she uses a computer when she writes a letter and noted that her name/title were not the same font as the rest of the letter but instead were typed in. Ms. Jones stated that she is currently a buyer for the Racing Commission, but that at the time of the letter she was a clerk 3.
The letterhead was an old style no longer used at the time in early 1998. The undated letter was not stamped received by State Purchasing as were the others, nor was any mailing envelope found in the State Purchasing file.
The IG spoke with plaintiff Mauberret. According to the reports, Mauberret initially claimed that he dealt with Jones, who he contacted at the suggestion of his sister Catherine, a veterinarian for the Racing Commission. According to the IG's reports, Mauberret later changed his story and claimed that he spoke with someone at the Racing Commission office but that he did not know whom. The final report attaches the letter in question as well as a document with an undisputed Jones' signature. Mauberret claimed that he left a list of chemicals with a person there. However, the Inspector General's reports note that none of the people who would have *584 had contact with him recalled Delta Chemical Corp. is approved to bid on a brand name contract. We anticipate using the following items." In one column the document states: "Anticipated Annual Usage" and then lists the quantity. The list is the same for all three agencies.
The IG concluded that: (1) the foregoing conditions may be in violation of La. R.S. 14:133, concerning the filing of false public records; (2) Halbon Terry Sharp improperly submitted false letters of intent overstating the types and quantities of the plaintiffs' products used by Southeast; (3) Ms. Huddleston improperly signed and submitted false letters of intent as Delgado's Kenner office had no need or intent to purchase the plaintiffs' products; (4) the Commission had no need or intent to purchase products from the plaintiffs; (5) the Commission letter was a forgery, but the IG noted in the final report that he did not know who forged the letter; and (6) the plaintiffs solicited letters of intent to purchase its products from three state agencies, two of which had no use for them, and that Delta provided information that was used in false submissions to State Purchasing.
Accordingly, the IG recommended that: (1) Delgado should take proper disciplinary action concerning Ms. Huddleston; (2) State Purchasing should take appropriate action in regards to the plaintiffs' brand name contract; (3) State Purchasing should consider "debarment proceedings;" and (4) the District Attorney for East Baton Rouge Parish and the State Board of Ethics should review the IG's report. The plaintiffs' petition noted that State Purchasing failed to renew its brand name contract when it lapsed in September 1999; however, the petition also stated that State Purchasing awarded the plaintiffs a new brand name contract in February 2000.
The plaintiffs secured the services of Mary Ann Sherry, a document examiner. Ms. Sherry's report reveals that she examined photocopies of the Sandra Jones letter of intent as well as several other photocopied documents obtained from the Commission that exhibit undisputedly Ms. Jones' signatures. Ms. Sherry concluded that the writer of the undisputed signatures also wrote the disputed signature. Accordingly, the plaintiffs sent a copy of Ms. Sherry's conclusion to the IG and asked him to rescind his report. The IG declined the request and the defamation lawsuit followed.
The primary issue before the court concerns the reasonableness of the attorney's fees and costs awarded to the IG. In this regard, we apply the manifest error/clearly wrong standard of review.[3]
The IG's office was created 1 April 1988, by executive order of Governor Buddy Roemer, BR 88-10.[4] It was recreated by Governor Edwin Edwards through Executive Order EWE 92-59. The Office was continued by both Governor M.J. "Mike" Foster, Jr. and Governor Kathleen Babineaux Blanco. Executive Order BR 88-10 provides in pertinent part:

*585 NOW, THEREFORE, I BUDDY ROEMER, Governor of the State of Louisiana, by virtue of the authority vested in me by the Constitution and Laws of the State of Louisiana, do hereby establish in the Executive Department, Office of the Governor, Division of Administration, the Office of State Inspector General, to examine, investigate, and make recommendations with respect to the prevention, and detection of waste, inefficiencies, mismanagement, and abuse in all the state agencies, boards, commissions, authorities, task forces, departments and divisions of the executive branch of state government. [Emphasis added.][5]
In its first assignment of error, the plaintiffs urge the court to reconsider its prior rulings in this case that were addressed through the defendants filing of applications for supervisory writs. The plaintiffs argue that the law of the case doctrine should not apply because the prior decisions are erroneous and result in manifest injustice to them.
In Day v. Campbell-Grosjean Roofing & Sheet Metal Corp., 260 La. 325, 330, 256 So.2d 105, 107 (La.1972), the Supreme Court stated:
With regard to an appellate court, the "law of the case" refers to a policy by which the court will not, on a subsequent appeal, reconsider prior rulings in the same case. This policy applies only against those who were parties to the case when the former appellate decision was rendered and who thus had their day in court. Among reasons assigned for application of the policy are: the avoidance of indefinite relitigation of the same issue; the desirability of consistency of the result in the same litigation; and the efficiency, and the essential fairness to both parties, of affording a single opportunity for the argument and decision of the matter at issue.
Nevertheless, the law-of-the-case principle is applied merely as a discretionary guide: Argument is barred where there is merely doubt as to the correctness of the former ruling, but not in cases of palpable former error or so mechanically as to accomplish manifest injustice. Further, the law-of-the-case principle is not applied so as to prevent a higher court from examining the correctness of the ruling of the previous court.
See also, Zatarain v. WDSU-Television, Inc., 95-2600, p. 10 (La.App. 4 Cir. 4/24/96), 673 So.2d 1181, 1186 ("This court generally applies the `law of the case' doctrine when reviewing an issue decided on supervisory writs as part of the appeal of the case following a trial on the merits, except when it finds either that the previous decision is based on palpable error or that manifest injustice would result.").
In Trentecosta v. Beck, 96-2388, p. 10 (La.10/21/97), 703 So.2d 552, 559, the Supreme Court defined defamation as a tort involving the invasion of a person's interest in his or her reputation and good name. In Costello v. Hardy, 03-1146, p. 12 (La.1/21/04), 864 So.2d 129, 139, the Supreme Court enumerated the following four elements that are necessary to establish a cause of action for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault at least amounting to negligence on the part of the publisher *586 of the information; and (4) resulting injury. The Court also stated that the fault element is often considered in the jurisprudence to be actual or implied malice. Id. The Court also stated that: "The fault requirement is generally referred to in the jurisprudence as malice, actual or implied." Id.
In Sassone v. Elder, 626 So.2d 345, 353-54 (La.1993), the Supreme Court stated:
Plaintiffs in effect claim defamation by innuendo. In defamation by implication or innuendo, the court must distinguish between statements of opinion and statements of fact. In the case of opinion, if the defendant states non-defamatory facts on which he bases his derogatory opinion, he is not liable for defamation unless the opinion indicates the existence of other facts which are defamatory and would justify the forming of the opinion. Restatement (Second) of Torts § 566 cmt. c (1977). But if the defendant states a derogatory opinion without disclosing the facts on which it is based, he may be liable for defamation if the comment creates the reasonable inference that the opinion is justified by the existence of undisclosed defamatory facts. Id.

The case before us presents a similar situation. We have reviewed the appellate record before us, our prior rulings, and the IG's reports. We specifically note that the plaintiffs were given an opportunity to refute the IG's findings of fact and opinions in the draft report before the final report was published on the IG's website. Although the IG may have arrived at some derogatory opinions, the facts on which those opinions are based are not defamatory; they simply are the facts as discovered by his office. Because the IG cannot issue subpoenas or compel testimony, the office must rely on the cooperation of the covered agencies. We also find, based on a review of the entire record, no evidence of malice, actual or implied, on the part of the IG.
Thus, we do not find sufficient reason to avoid the application of the law of the case doctrine. Therefore, this assignment of error is without merit.
The plaintiffs' remaining assignments of error involve the trial court's award of attorney's fees to the IG. The first argument is that the award to the IG is in derogation of the plaintiffs' common rights and inconsistent with the intent and purpose of La. C.C.P. art. 971, which states in pertinent part:
A. (1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or Louisiana Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established a probability of success on the claim.
* * *
B. In any action subject to Paragraph A of this Article, a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs.
When La. C.C.P. art. 971 was enacted in 1999, Section 2 of Acts 1999, No. 734 (§ 1 of which enacted this article) provided:
Section 2. The legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. The legislature finds and declares that it is in the public interest to encourage continued participation in matters of public *587 significance, and that this participation should not be chilled through abuse of the judicial process. To this end, it is the intention of the legislature that the Article enacted pursuant to this Act shall be construed broadly." [Emphasis added.]
We do not find that the plaintiffs' common rights have been derogated by an award of attorney's fees to the IG.[6] We reject the plaintiffs' contention that the article be strictly construed in light of the Legislature's plain language. We note that had the plaintiffs succeeded, they, too, might have been entitled to an attorney's fees award.[7]
The plaintiffs also ask that the article be applied only to media-related defendants. In State v. Dick, 06-2223 (La.1/26/07), 951 So.2d 124, the Supreme Court recently set forth the law regarding statutory interpretation:
The function of statutory interpretation and the construction to be given to legislative acts rests with the judicial branch of the government. The rules of statutory construction are designed to ascertain and enforce the intent of the legislature. Legislation is the solemn expression of legislative will and, thus, the interpretation of legislation is primarily the search for the legislative intent. We have often noted the paramount consideration in statutory interpretation is ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law.
The starting point in the interpretation of any statute is the language of the statute itself. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature." [See, La. C.C. art. 9.] However, "when the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law." Moreover," when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole."
Id. at p. 9, 951 So.2d at 130. [Citations omitted; reference added.]
We find no ambiguities in article 971. Had the Legislature intended to limit its *588 application to media-related defendants, it would have done so. In addition, we find no reason to exclude the IG from the article. Finally, we find that the plaintiffs have misconstrued Lee v. Pennington, 02-0381 (La.App. 4 Cir. 10/16/02), 830 So.2d 1037. Nothing in that opinion should be read as limiting the scope of the article, but for those entities clearly enumerated therein.[8]
Next, the plaintiffs contend that the trial court should not have awarded attorney's fees under La. C.C.P. art. 971 B without considering mitigating factors presented in the litigation.
Statutes providing for penalties and attorney's fees are penal in nature and must be strictly construed. Adams v. Burger King, 04-0146, p. 6 (La.App. 1 Cir. 2/11/05), 906 So.2d 540, 544, citing Langley v. Petro Star Corp. of La., 01-0198, pp. 3-4 (La.6/29/01), 792 So.2d 721, 723. However, we find that the statute does not allow us to consider any mitigating factors, such as the propriety of the original lawsuit. Article 971 B states that "a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs." [Emphasis added.] We do not read the statute as allowing the court to determine whether an award of attorney's fees and costs, in and of itself, is reasonable, only whether the amount awarded is reasonable.
We recognize that prior decisions from this court have looked at mitigating factors when determining whether an award of attorney's fees is warranted. Mitigating factors are primarily a decision for the trier of fact. However, because of Louisiana's civilian tradition, this court must begin every legal analysis by examining primary sources of law, consisting of the constitution, codes, and statutes; jurisprudence, even when it arises to the level of jurisprudence constante, is a secondary law source. See Alvin B. Rubin, Hazards of a Civilian Venturer in Federal Court: Travel and Travail on the Erie Railroad, 48 La. L.Rev. 1369, 1372 (1988). Judicial decisions are not intended to be an authoritative source of law, and, thus, the civilian tradition does not recognize the doctrine of stare decisis. Doerr. v. Mobil Oil Corp., 00-0947, pp. 13-14 (La.12/19/00), 774 So.2d 119, 128.
We hold that La. C.C.P. art. 971 B mandates an award of "reasonable attorney fees and costs." We are, however, allowed, and even required, to determine if the amount awarded is reasonable, thereby considering whether "mitigating factors" are applicable.
Recognizing that provisions in the law awarding attorney's fees and costs are penal in nature and must be strictly construed, we find that the IG can recover only those fees associated with the motion to strike. We do not agree with the IG's position that the IG is entitled to recover the attorney's fees and costs incurred from the time the suit was filed until the day the trial court made the award. Thus, for example, the IG cannot recover attorney's fees related to its litigation in this case of the venue issue. Therefore, we find the award of $20,000.00 is excessive and reverse the judgment of the trial court.
We also find the evidence submitted by the IG supporting the attorney's fees and costs is completely inadequate. Looking at the evidence, this court cannot determine how much time was spent on *589 the article 971 motion or any other aspect of this case. Therefore, we remand the matter to the trial court for a new determination of attorney's fees and costs incurred only in preparing the article 971 motion, preparing memoranda of law relating thereto, and trying the motion to strike, based on the submission of detailed time records that describe with precision what was done and by whom.
Based on the foregoing, we reverse the judgment of the trial court and remand the matter for further proceedings consistent with this opinion.
REVERSED; REMANDED.
NOTES
[1] Brand name contracts are awarded when a demand is established for a specific brand of product. A manufacturer or supplier has a distinct pricing advantage when bidding on its own brand and is often awarded the contract. The brand name contract gives the sole supplier of a given item the advantage of not having to bid on its products when they are sought by a state agency.
[2] The plaintiffs initially filed suit against the defendants on 23 May 2000 in Jefferson Parish. The Commission excepted to venue in Jefferson Parish pursuant to La. R.S. 4:145.1, which provides that the Commission may only be sued in the parish of Orleans. All defendants filed a special motion to strike, as well as a motion to stay discovery, pursuant to La. C.C.P. art. 971. On 26 September 2000, the trial court deferred ruling on the motion to strike, but granted the Commission's exception and transferred this matter to the Civil District Court for the Parish of Orleans. The plaintiffs unsuccessfully petitioned the Louisiana Fifth Circuit Court of Appeal and Supreme Court for reversal of the transfer order.
[3] The granting of a special motion to strike pursuant to article 971 presents a question of law. Appellate review regarding questions of law is simply a review of whether the trial court was legally correct or legally incorrect. Dixon v. First Premium Ins. Group, 05-0988, p. 5 (La.App. 1 Cir. 3/29/06), 934 So.2d 134. On legal issues, the appellate court gives no special weight to the findings of the trial court, but exercises its constitutional duty to review questions of law and renders judgment on the record. Clements v. Folse ex rel. Succession of Clements, 01-1970, p. 5 (La.App. 1 Cir. 8/14/02), 830 So.2d 307, 312.
[4] Authority for the establishment of the IG's office is found in La. R.S. 39:7 and 39:8.
[5] We note that the Executive Orders 88-10 and 92-59 creating and recreating the IG's office do not authorize the IG to issue subpoenas in order to perform investigations. See, 12:3 La. Reg. 211 (4/20/88); 14:4 La. Reg. 1042 (8/20/92). Instead, all covered agencies are required to "extend full cooperation and all reasonable assistance to the state inspector general and his designees."
[6] To the extent that the plaintiffs are arguing that La. C.C.P. art. 971 is unconstitutional, that issue is not before us. See, La. C.C.P. art. 1880. In any event, in Lee v. Pennington, 02-0381 (La.App. 4 Cir. 10/16/02), 830 So.2d 1037, we found the statute constitutional. We decline to revisit the issue here.
[7] In 2000, when this suit was filed, article 971 B stated that a prevailing defendant on a special motion to strike "shall be entitled to recover" reasonable "attorney's fees and cost." However, a plaintiff could only similarly recover if the court found that "a special motion to strike is frivolous or is solely intended to cause unnecessary delay." In 2004, article 971 B was amended to state that "a prevailing party on a special motion to strike shall be awarded reasonable attorney fees and costs." Pursuant to La. C.C. art. 6: "In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary."

The difference between a substantive law and a procedural law is that a procedural law merely prescribes a method of enforcing a previously existing right whereas a substantive law creates a new obligation where none existed before. Guste v. Burris, 417 So.2d 445 (La.App. 1 Cir.1982); reversed on other grounds, 427 So.2d 1178 (La.1983). Because the statute changed the requirements for a plaintiff's ability to recover attorney's fees, the change in the statute was substantive and has prospective application only.
[8] La. C.C.P. art. 971 E states:

This Article shall not apply to any enforcement action brought on behalf of the state of Louisiana by the attorney general, district attorney, or city attorney acting as a public prosecutor.